**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**Eastern Division**

MORRIS BIAS and CLARENCE KNOX, *on behalf of themselves and all individuals similarly situated,*

Plaintiffs,

v.

FSST MANAGEMENT SERVICES, LLC d/b/a 605 LENDING; DUSTIN DERNIER; STEVE CHRISTENSEN; VELOCITY VENTURES GROUP, LLC d/b/a INFINITY ENTERPRISE LENDING SYSTEMS; LEAD BANK; and JOHN DOES 1-20,

*in their individual capacities*,

and

ANTHONY REIDER; CYNTHIA WEDDELL; APRIL HERRICK; RYAN KILLS A HUNDRED; KRISTI BIETZ; DAVID ROSS; JONATHAN SCHRADER SR.;

*in their official capacities*,

Defendants.

Civil Action No. 1:26-cv-10438

**CLASS ACTION COMPLAINT**

Plaintiffs, *on behalf of themselves and all individuals similarly situated*, by counsel, and for their Complaint against Defendants, allege as follows:

**INTRODUCTION**

1. Usury—the practice of lending money at unreasonably high rates of interest—"is an ancient crime by which the powerful exploit the most poor and desperate." *Dunn v. Glob. Tr. Mgmt., LLC*, 2020 WL 7260771 (M.D. Fla. Dec. 10, 2020). And "[a]s ancient as the practice of

usury and loansharking may be, equally old are circumvention schemes to avoid its prohibition." *Id*. This case involves one of those schemes, which is commonly referred to as a "tribal lending" business model, or more colloquially, as a "rent-a-tribe" scheme, a "recent incarnation of payday lending companies regulation-avoidance." Nathalie Martin & Joshua Schwartz, *The Alliance Between Payday Lenders and Tribes: Are Both Tribal Sovereignty and Consumer Protection at Risk?*, 69 Wash. & Lee L. Rev. 751, 785 (2012).

2. Non-tribal payday lenders and third-party funders wishing to use this model to circumvent state legal prohibitions on usurious lending go searching for a small, easily dominated tribe that will be willing to serve as the consumer-facing façade for the usury scheme, in return for receiving a small portion of the revenue generated (the "rent" referred to in the "rent-a-tribe" label) and, often, some call-center jobs. The tribal entity playing this role serves as the nominal lender for the purpose of enabling the non-tribal actors running the operation to make the dubious and legally incorrect claims that (a) the loans are subject only to tribal law, not the protections created by state usury and licensing laws, and (b) that they themselves are somehow vicariously protected by the tribe's sovereign immunity.

3. In this case, FSST Management Services, LLC d/b/a 605 Lending ("605 Lending" or "605") holds itself out as a tribal lending entity owned and operated by the Flandreau Santee Sioux Tribe ("Tribe"), a federally recognized Native American Tribe based in South Dakota.

4. Through the 605 Lending front, Defendants have conspired to fund, issue, service, and collect triple-digit interest loans that far exceed the usurious interest protections enshrined in the laws of nearly every State in the Union. For example, 605 Lending issued loans to Mr. Bias with interest rates over 700%, even though Illinois caps interest on payday loans to 36%. In other

words, Defendants have funded, issued, and collected loans from Illinois consumers with ***more than 20 times the interest*** permitted by Illinois law.

5. But federal law does not grant Native American tribes any special power to make loans over the internet to consumers across the United States in violation of state usury restrictions. On the contrary, it is well settled that "[a]bsent a federal law to the contrary, Indians going beyond reservation boundaries have generally been held subject to non-discriminatory state law otherwise applicable to all citizens of the State." *Mescalero Apache Tribe v. Jones*, 411 U.S. 145, 148–49 (1973). Nonetheless, the tribal leaders and non-tribal coconspirators named as Defendants have deliberately chosen to enter and facilitate the loansharking enterprise described below.

6. Indeed, the tribal façade used by Defendants to evade state consumer protections is nothing more than a farce. Although nominally an arm of the Tribe, 605 Lending is in fact controlled and directed by Dustin Dernier, the CEO of 605 and a resident of Missouri who, upon information and belief, is not—and has never been—a member of the Tribe. Instead, Dernier has a long history of partnering with the Tribe to establish multiple lending fronts using funds from non-tribal investors and management partners recruited by him.

7. Among those recruited by Dernier to his lending enterprise are Steve Christensen, 605 Lending's COO, and Velocity Ventures Group, LLC d/b/a Infinity Enterprise Lending Systems ("Infinity"), a non-tribal business based in Nevada that provides the software and essential technological support for the underwriting, approval, servicing, and collection of the usurious loans. And Defendant Lead Bank—another non-tribal entity recruited by Dernier—provides the automatic payment processing services for 605 to be able to collect on its loans. The Enterprise alleged herein is in turn funded and operated by yet-to-be-identified investors, managers, officers, and directors—the John Doe Defendants—whose identities will be confirmed through discovery.

8. Of course, although funded and operated by non-tribal members, the scheme would not be possible without the Tribe's knowing and willful participation in chartering each lending front to give it the nominal appearance of having tribal sovereign immunity—a necessary component of Defendants' attempt to evade state usury protections. In return for this cloak tribal immunity, upon information and belief, Dernier and others have entered into agreements with the Tribe to provide a small share of the revenues (approximately 3%) from the scheme to the Tribe. The vast majority of the millions collected from the usurious lending scheme thus goes to Dernier and his non-tribal coconspirators.

9. Defendants Anthony Reider, Cynthia Weddell, April Herrick, Ryan Kills A Hundred, Kristi Bietz, David Ross, and Jonathan Schrader Sr. (collectively, the "Tribal Defendants")[1] are members of the Tribe's Executive Committee, which comprises the Tribe's executive officers (Redier, Weddell, Herrick, and Kills A Hundred) and elected trustees (Bietz, Ross, and Schrader). The Tribe's Constitution establishes the Executive Committee as the "governing body" of the Tribe. FSST Const., art. III § 1.[2] The Committee is empowered to, among other powers: "acquire, lease, or otherwise manage all lands or other assets, either real or personal, for the benefit of the Tribe as authorized by law;" "promulgate and enforce ordinances governing and regulating the conduct of all persons on the reservation"; and "charter subordinate organizations for economic purposes and to delegate to such organizations, or to any subordinate boards or officials of the Tribe, any of the foregoing powers, reserving the right to review any action taken by virtue of such delegated powers." *Id.* art. VIII § 1.

---

[1] The Defendants sued in their individual capacities are referred to herein as the "Non-Tribal Defendants."

[2] The Tribe's Constitution is available at https://fsst-nsn.gov/hubfs/2022-FSST-Constitution-final.pdf?hsLang=en (last visited Aug. 13, 2026).

10. Pursuant to the powers granted them under the Tribe's Constitution, over at least the past 13 years, the Tribal Defendants have chartered several lending entities that were ostensibly owned and operated by the Tribe but, like 605 Lending, are in fact funded, underwritten, and operated by non-tribal individuals and entities. These entities include 605 Lending, FSST Financial Services, LLC d/b/a MB Marketing, Blue Dart Ventures, and Rushmore Financial. The usurious lending entities ostensibly owned and operated by the Tribe—most of which, upon information and belief, are no longer in business—are referred to collectively herein as the "Tribal Lending Entities" or "TLEs."

11. Through the TLEs, and, most recently, 605 Lending, Defendants have actively participated in the scheme and have conspired with each other and others to repeatedly violate state lending statutes resulting in the collection of unlawful debt from Plaintiffs and the members of the class described below.

12. Defendants and others not yet known to Plaintiffs have been knowingly participating in the illegal lending enterprise, which has made and is making and has collected and is collecting on grossly usurious loans. This lawsuit challenges the legality of 605 Lending's high-interest loans and seeks damages and declaratory relief against coconspirators participating in this illegal scheme, including, most importantly, those whose identities have been deliberately concealed. More specifically, Plaintiffs seek relief under the Racketeer Influenced and Corrupt Organizations Act ("RICO"); and various state usury and lending statutes. 605 Lending and related entities have likely collected tens of millions of dollars on void loans in violation of federal and state usury, licensing, and criminal statutes.

## JURISDICTION

13. This Court has subject matter jurisdiction pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1332(d)(2). Moreover, the Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

14. This Court has personal jurisdiction over Defendants because RICO authorizes nationwide service of process. As a result, personal jurisdiction over a defendant may be exercised anywhere in the United States so long as it does not violate the Fifth Amendment. *See Lisak v. Mercantile Bancorp, Inc.*, 834 F.2d 668, 671 (7th Cir. 1987).[3] Because Defendants are all residents of the United States, the Court has personal jurisdiction over them under the Fifth Amendment.

15. The Court also has personal jurisdiction over the Defendants because they knowingly participated in the making and collection of unlawful loans to Illinois residents, including Plaintiff Bias. *See Gingras v. Rosette*, 5:15cv101, 2016 WL 2932163, at *2-3, *9 (D. Vt. May 18, 2016), *aff'd sub nom. Gingras v. Think Fin., Inc.*, 922 F.3d 112 (2d Cir. 2019) (finding that tribal lender's contacts with Vermont "would have been sufficient to subject [the tribal entity] to personal jurisdiction in Vermont" for purposes of claims for violations of state and federal law,

[3] *See also Bd. of Trs., Sheet Metal Workers' Nat'l Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031, 1035 (7th Cir. 2000) (finding that, in the context of ERISA, "[the Seventh Circuit] ha[s] concluded that nationwide service under other statutes is proper, as long as the defendants have adequate contacts with the United States as a whole"); *Diamond Mortg. Corp. v. Sugar*, 913 F.2d 1233, 1244 (7th Cir. 1990) ("[T]he sovereign exercising its authority over the [defendants] is the United States," and therefore "whether there exist sufficient minimum contacts between the [defendants] and the State of Illinois has no bearing upon whether the United States may exercise its power over the [defendants] pursuant to its federal question jurisdiction."); *Siswanto v. Airbus*, 153 F. Supp. 3d 1024, 1027–28 (N.D. Ill. 2015) ("[W]hen the basis of personal jurisdiction involves a statute providing for nationwide service of process ... [t]he relevant minimum contacts in these instances simply lie with the United States as a whole and not just the forum state (here, Illinois)." (internal citation omitted)); *Johnson Controls, Inc. v. Exide Corp.*, No. 00 C 3852, 2000 WL 1849293, at *1 (N.D. Ill. Dec. 15, 2000) ("By thus authorizing the nationwide service of process, Section 1965(b) creates personal jurisdiction over any person within the United States.").

where tribal entity operated a website that advertised loans in Vermont, sent emails and loan applications to Vermont consumers and transferred loan principal to consumers' Vermont bank accounts); *Duggan v. Martorello*, 18cv12277, 2022 WL 952183 (D. Mass. Mar. 30, 2022).

16. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions with respect to Plaintiffs' claims took part in this District and Division, where Plaintiff Bias resides. Alternatively, to the extent a substantial part of the events or omissions giving rise to Plaintiffs' claims did not occur here, venue still lies in this District, as all defendants are not residents of this State and, given the geographic disparity of the defendants and coconspirators who participated in making and collecting the high-interest loans from their respective states of residence, there is no judicial district in which a substantial part of the events or omissions giving rise to Plaintiffs' claims would have otherwise occurred. Plaintiffs may therefore bring their claim in any judicial district in which defendants are subject to the Court's personal jurisdiction, which includes this District.

## PARTIES

17. Plaintiff Morris Bias is a natural person and resident of this District and Division.

18. Plaintiff Clarence Knox is a natural person and resident of Florida.

19. Defendant FSST Management Services, LLC d/b/a 605 Lending is an online lender that offers loans to consumers at triple-digit interest rates in the range of 500-700% or more. It purports to be an entity organized under the laws of, and owned and controlled by, the Flandreau Santee Sioux Tribe.

20. Defendant Dustin Dernier is a natural person and resident of Missouri. He may be found at 4313 SW Hickory Lane, Blue Springs, MO 64015-4518. Dernier is the CEO of 605

Lending and, in that role, has been instrumental in carrying out the usurious lending scheme, as described in detail below. He is sued in his individual capacity.

21. Defendant Steve Christensen is a natural person and resident of South Dakota. He may be found at 305 S. 13th Street, Flandreau, SD 57028-1544. Christensen is the COO of 605 Lending and, in that role, has been instrumental in carrying out the usurious lending scheme, as described in detail below. He is sued in his individual capacity.

22. Defendant Velocity Ventures Group, LLC d/b/a Infinity Enterprise Lending Systems is a limited liability company with its principal address at 4864 Sparks Boulevard, Sparks, NV 89436. It has a registered agent at Corporation Creations Network, Inc., 8275 South Eastern Avenue, Suite 200, Las Vegas, NV 89123. According to its website, Infinity's "loan management software is an advanced, powerful and end-to-end lending solutions designed for short-term lenders."[4] Infinity's software covers "loan origination and servicing" as well as "collections and reporting . . . automat[ing] the entire loan lifecycle." As detailed below, Infinity knowingly entered partnerships with 605 Lending, Dernier, and other coconspirators to provide the management software for 605's lending operations, receiving at least some portion of the revenues from the usurious scheme in return. Infinity is liable for the damages caused by the usurious lending conspiracy it willingly and knowingly entered and profited from.

23. Defendant Lead Bank is a state-chartered bank organized under the laws of Missouri. Its principal place of business is 1801 Main Street, Kansas City, MO 64018. It has a registered agent at CT Corporation System, 5661 Telegraph Road, Suite 4B, St. Louis, MO 63129. As detailed below, Lead Bank provides the payment processing for 605 Lending that allows 605

[4] https://infinitysoftware.com/ (last visited Aug. 13, 2026).

to collect on the usurious loans through automatic payment transfers from consumer bank accounts.

24. Defendant Anthony Reider is a natural person and resident of South Dakota. He is the President of the Tribe's Executive Committee. Both as president and a general member of the Executive Committee, Defendant Reider's duties include the chartering and oversight of 605 Lending and the other TLEs chartered by the Tribe. In performing these duties, Defendant Reider meets at least monthly with other members of the Committee to review, perform, and implement high-level management of the Tribal Lending Entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the TLEs; and approval of agreements between each entity and nontribal coconspirators. Plaintiffs seek injunctive and declaratory relief against from Defendant Reider in his official capacity.

25. Defendant Cynthia Weddell is a natural person and resident of South Dakota. She is the Vice President of the Tribe's Executive Committee. Both as vice president and a general member of the Executive Committee, Defendant Weddell's duties include the chartering and oversight of 605 Lending and the other TLEs chartered by the Tribe. In performing these duties, Defendant Weddell meets at least monthly with other members of the Committee to review, perform, and implement high-level management of the Tribal Lending Entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the TLEs; and approval of agreements between each entity and nontribal coconspirators. Plaintiffs seek injunctive and declaratory relief against from Defendant Weddell in her official capacity.

26. Defendant April Herrick is a natural person and resident of South Dakota. She is the Secretary of the Tribe's Executive Committee. Both as secretary and a general member of the

Executive Committee, Defendant Herrick's duties include the chartering and oversight of 605 Lending and the other TLEs chartered by the Tribe. In performing these duties, Defendant Herrick meets at least monthly with other members of the Committee to review, perform, and implement high-level management of the Tribal Lending Entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the TLEs; and approval of agreements between each entity and nontribal coconspirators. Plaintiffs seek injunctive and declaratory relief against from Defendant Herrick in her official capacity.

27. Defendant Ryan Kills A Hundred is a natural person and resident of South Dakota. He is the Treasurer of the Tribe's Executive Committee. Both as treasurer and a general member of the Executive Committee, Defendant Kills A Hundred's duties include the chartering and oversight of 605 Lending and the other TLEs chartered by the Tribe. In performing these duties, Defendant Kills A Hundred meets at least monthly with other members of the Committee to review, perform, and implement high-level management of the Tribal Lending Entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the TLEs; and approval of agreements between each entity and nontribal coconspirators. Plaintiffs seek injunctive and declaratory relief against from Defendant Kills A Hundred in his official capacity.

28. Defendant Kristi Bietz is a natural person and resident of South Dakota. She is a Trustee on the Tribe's Executive Committee. Both as a trustee and general member of the Executive Committee, Defendant Bietz's duties include the chartering and oversight of 605 Lending and the other TLEs chartered by the Tribe. In performing these duties, Defendant Bietz meets at least monthly with other members of the Committee to review, perform, and implement high-level management of the Tribal Lending Entities, including but not limited to approval of the

creation of each entity; the appointment and removal of the board members of the TLEs; and approval of agreements between each entity and nontribal coconspirators. Plaintiffs seek injunctive and declaratory relief against from Defendant Bietz in her official capacity.

29. Defendant David Ross is a natural person and resident of South Dakota. He is a Trustee on the Tribe's Executive Committee. Both as a trustee and general member of the Executive Committee, Defendant Ross's duties include the chartering and oversight of 605 Lending and the other TLEs chartered by the Tribe. In performing these duties, Defendant Ross meets at least monthly with other members of the Committee to review, perform, and implement high-level management of the Tribal Lending Entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the TLEs; and approval of agreements between each entity and nontribal coconspirators. Plaintiffs seek injunctive and declaratory relief against from Defendant Ross in his official capacity.

30. Defendant Jonathan Schrader, Sr. is a natural person and resident of South Dakota. He is a Trustee on the Tribe's Executive Committee. Both as a trustee and general member of the Executive Committee, Defendant Schrader's duties include the chartering and oversight of 605 Lending and the other TLEs chartered by the Tribe. In performing these duties, Defendant Schrader meets at least monthly with other members of the Committee to review, perform, and implement high-level management of the Tribal Lending Entities, including but not limited to approval of the creation of each entity; the appointment and removal of the board members of the TLEs; and approval of agreements between each entity and nontribal coconspirators. Plaintiffs seek injunctive and declaratory relief against from Defendant Schrader in his official capacity.

31. The John Doe Defendants Nos. 1-20 are the as-yet unknown individuals and business organizations that designed, are operating, and have extracted most of the revenue from

the usurious lending enterprise. Their identity, which has been hidden as a key part of the underlying scheme, will be easily established in this litigation.

## FACTUAL BACKGROUND

### A. State usury and licensing laws protect consumers from usurious loans.

32. "From times immemorial," state governments have sought to "protect desperately poor people from the consequences of their own desperation" through usury laws. *Otoe-Missouria Tribe of Indians v. N.Y. State Dep't of Fin. Servs.*, 974 F. Supp. 2d 353, 356 (S.D.N.Y. 2013).

33. Typically, state usury laws involve: (1) an interest rate cap; and/or (2) a licensing requirement for lenders. Almost every state in the country has enacted one or both of these requirements, including Illinois and Florida, *i.e.*, the home states of each of the Plaintiffs where they applied for, received, and repaid their loans.

#### i. Illinois

34. Illinois enacted the Predatory Loan Prevention Act in 2021 to combat predatory lending practices like those at issue in this litigation. *See* 815 ILCS § 123/15-1-1, *et seq.*

35. In passing the PLPA, the Illinois legislature found that "Illinois families [at that time] pay over $500,000,000 per year in consumer installment, payday, and title loan fees." The legislature further noted that "nearly half of all Illinois payday loan borrowers earn less than $30,000 per year, and the average annual percentage rate of a payday loan is 297%." Illinois's General Assembly enacted the PLPA to "protect consumers from predatory loans," directing that the Act be "liberally construed to effectuate its purpose." *See id.* § 123/15-1-5.

36. The Act limits lenders to no more than 36% interest. *See id.* § 123/15-5-5.

37. "Any loan made in violation of [the interest rate cap] is null and void and no person or entity shall have any right to collect, attempt to collect, receive, or retain any principal, fee, interest, or charges related to the loan." *See id.* § 123/15-5-10.

38. A violation of the PLPA is deemed a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, *see id.* § 123/15-10-5, which in turn provides a right to obtain actual and punitive damages and other relief that a court deems proper, 815 ILCS § 50-5/10a.

**ii. Florida**

39. Florida has enacted usury laws that prohibit lenders from making high interest loans.

40. The Florida legislature passed laws prohibiting usury as early as 1822, before Florida even became a state in 1845.[5] As the Florida Supreme Court noted, "The very purpose of statutes prohibiting usury is to bind the power of creditors over necessitous debtors and prevent them from extorting harsh and undue terms in the making of loans." *Chandler v. Kendrick*, 146 So. 551, 552 (Fla. 1933).

41. Pursuant to Florida Statute § 687.03, interest rates greater than 18% per annum on loans in the amount of $500,000 or less are usurious. Those who violate the usury provisions must forfeit "the entire interest so charged, or contracted to be charged" and double the amount of usurious interest paid. Fla. Stat. § 687.04.

42. Additionally, in Florida, lenders must be licensed by the Office of Financial Regulation, and loans of $25,000 or less with interest exceeding 18% per annum are void and

[5] *See* Jeremiah W. Blydenburgh, *A Treatise On The Law Of Usury; To Which Are Added, The Statutes Of Several States Relating To Interest Now In Force*, 172 (1844), *available at* https://books.google.com/books?id=6Fk9AAAAIAAJ&printsec=frontcover&source=gbs_ge_summary_r&cad=0#v=onepage&q&f=false.

unenforceable. Fla. Stat. § 516.02(1-2). Even with a license, a lender may not charge interest exceeding 30% on the first $3,000 of the principal amount, 24% on the part of the principal amount exceeding $3,000 and up to $4,000, and 18% on that part of the principal amount exceeding $4,000 and up to $25,000. Fla. Stat. § 516.031(1). Neither the Defendants nor the MITW Lending Entities, including Fineday, have obtained licenses to make loans in Florida.

43. If a lender (licensed or unlicensed) charges interest greater than legally permitted, the loan is void and unenforceable. Fla. Stat. § 516.02(2)(c).

44. Further, under Florida law, it is a criminal offense to make usurious loans at rates of 25% of higher. Fla. Stat. § 687.071. Loan contracts in excess of the 25% threshold triggering criminal liability for usury are similarly "void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758–59 (Fla. 1935).

45. The Florida Attorney General has made clear that payday loans and similar loans are subject to Florida's usury laws. Fla. AGO 2000-26 (Fla. A.G.), 2000 WL 543211.

**xii. Other State Usury Laws**

46. Each state of residence of the putative class members in the below class definitions also has an interest rate cap and similar provisions to prevent the enforcement and collection of usurious debts.[6]

[6] *See* Ala. Code § 8-8-1; Alaska Stat. § 45.45.010; Ark. Const. Art. XIX § 13; Conn. Gen. Stat. §§ 37-4, 36a-573; D.C. Code §§ 28-3301, 28-3302; 6 Del. Code § 2301; Haw. Rev. Stat. § 478-2; Idaho Code § 28-22-104; 815 Ill. Comp. Stat. 205/4, 122/4-10; Kan. Stat. § 16-201; Ky. Rev. Stat. Ann. § 360.010; La. Stat. Ann. § 9:3500, *et seq.*; Mass. Gen. L. ch. 107 § 3, Mass. Gen. L. ch. 271 § 49; Me. Rev. Stat. tit. 9-B, § 432; Md. Const. art. III § 57, Md. Code, Com. Law § 12-103; Mich. Comp. Laws §§ 438.31, 438.32, 445.1854; Minn. Stat. § 334.01, et seq.; Miss. Code. § 75-17-1, et seq.; Mo. Ann. Stat. § 408.030(1); Mont. Code § 31-1-108; Neb. Rev. Stat. §§ 45-101.03, 45-102; N.H. Rev. Stat. § 336:1; N.M. Stat. §§ 56-8-3, 56-8-13; N.Y. Gen. Oblig. Law §§ 5-501, 5-511; N.Y. Banking Law § 14-a; N.R.S. § 99.040, 99.050; N.C. Gen. Stat. §§ 24-1, 24-1.1; N.D.

**B. Overview of the Tribal Lending Business Model.**

47. Many states have enacted usury laws because "[u]sury legislation to cap interest rates on loans predates the founding of our country." *Payday Today*, 903 N.E.2d at 1060 (citing Peterson, *supra*, at 1116 n.13).

48. Unfortunately, despite the multitude of state and federal protections to prevent usurious lending, predatory financial services "are heavily marketed to financially vulnerable consumers."[7] The collection of unlawful and usurious debt continues to be a major problem, in part because the profits to be realized by small, high interest loans are so high that illegal lenders are willing to take the significant risk of litigation and liability for their violations of state and federal law.

49. Over the past decade, payday lending has become "one of the fastest growing segments of the consumer credit industry," and as of 2005 "there were more payday-loan stores in the United States than McDonald's, Burger King, Sears, J.C. Penney, and Target stores combined." Martin & Schwartz, *supra* at 759 (quoting Karen E. Francis, Note, *Rollover, Rollover:*

---

Cent. Code §§ 47-14-05, 47-14-09; Ohio Rev. Code Ann. § 1343.04; Okla. Stat. tit. 15 § 266; Or. Rev. Stat. § 82.010; 41 Penn. Stat. §§ 201-202; 6 R.I. Gen. Laws §§ 6-26-1, 6-26-2; S.C. Code § 37-10-106(1); S.D. Code § 54-3-1.1, *et seq.*; Tenn. Code §§ 47-14-103, 47-14-117; Tex. Fin. Code §§ 302.001, 305.001, 305.003; Va. Code § 6.2-303; Vt. Stat. tit. 9, § 41a; Wash. Rev. Code § 19.52.010; W. Va. Code § 47-6-5; Wis. Stat. § 138.04; Wyo. Stat. § 40-14-106.

[7] *See* CFPB, *CFPB Finalizes Rule To Stop Payday Debt Traps* (Oct. 5, 2017), https://www.consumerfinance.gov/about-us/newsroom/cfpb-finalizes-rule-stop-payday-debt-traps/. Predatory financial services, including high-cost installment loans and payday debt traps, often involve "high-cost, small dollar loans to low income, low-credit borrowers" and "a repayment system that involves the lender withdrawing funds directly from the borrower's bank account." *Payday, Vehicle Title, and Certain High-Cost Installment Loans*, 131 Harv. L. Rev. 1852, 1852 (2018).

*A Behavioral Law and Economics Analysis of the Payday Loan Industry*, 88 Tex. L. Rev. 611, 611–12 (2010)).

50. It is no secret that "internet payday lenders have a weak history of complying with state laws." Martin & Schwartz, *supra* at 759.

51. Over the years, payday lenders have used various schemes to evade applicable state and federal protections. In one of these schemes, known colloquially as a "rent-a-bank" strategy, payday lenders would try to exploit banks' unique, federally granted power to make loans exceeding state usury rates. Under arrangements made with a willing bank, the payday lender would market, fund and collect loans nominally made by a bank that, for its part, earned fess without assuming much, if any, financial risk for the lending.

52. Because banks are insulated from state examination and regulation by virtue of federal bank preemption doctrines, many payday lenders were, for a period of time, able to operate openly from storefronts, using these "rent-a-bank" arrangements to evade enforcement in states where payday lending is illegal. However, beginning in 2005, the Federal Deposit and Insurance Corporation began to limit its regulated banks with regard to such "rent-a-bank" arrangements with payday lenders. *See* FDIC, Guidelines for Payday Lending, FIL-14-2005; *also see* Michael A. Stegman, *Payday Lending*, 21 *Journal of Economic Perspectives* 169, 178-79 (2007) (describing rent-a-bank scheme and regulatory reaction).

53. As this and other regulatory pressure began to reduce the prevalence of rent-a-bank evasions,[8] the shadow payday loan industry turned to Native American tribes to replace the banks

---

[8] The United States Department of Justice also began cracking down on "rent-a-bank" schemes through an initiative that targeted financial intermediaries such as banks that rented their names to payday lending schemes and other financial scams. *See* Jessica Silver-Greenberg, Justice Department Inquiry Takes Aim at Banks' Business With Payday Lenders, N.Y. TIMES (Jan. 26, 2014).

as the nominal lender behind their schemes, trying to take advantage of tribal insulation from state regulatory powers.

54. Under this new "rent-a-tribe" model, the leadership of an economically impoverished tribe would agree to play a figurehead, nominal lender role and accept the revenue and call-center jobs offered. In return, they would also agree to conceal the identity of the non-tribal actors who would operate the enterprise and extract most of the profits, by participating in a ruse that disguises the business as one managed by and for the sole benefit of the tribe.[9]

55. For example, in January 2009, one of the legal pioneers of the tribal lending model, Claudia Callaway, was "recommending that her clients move to a 'tribal model'" and "that under federal Indian law the tribal lender could make these loans, and they could sell the loans to a non-tribal entity, and the loans could be collected upon at the contract rate, and the loans would not be subject to state regulation." *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *2 (C.D. Cal. Aug. 31, 2016).

56. Callaway also advised her clients that tribal lending "contemplated two structures," *i.e.*, arm of the tribe lending or tribal member lending. *Id.*

57. Under either structure, Callaway claimed "the loans would be made under the laws of the tribe and would not have to comply with licensing and usury laws in states where borrowers resided." *Id.*

[9] The use by payday lenders of tribal veneers as an artifice to evade state law has been widely publicized. *See, e.g.*, H.R., Committee on Financial Services, Dem. Staff Report, "Skirting the Law: Five Tactics Payday Lenders Use to Evade State Consumer Protection Law," June 16, 2016, at 15 ("Renting Sovereign Immunity"); Carter Dougherty, "Payday Lenders and Indians Evading Laws Draw Scrutiny," Bloomberg, June 5, 2012; Jeff Guo, "Many States Have Cracked Down on Payday Loans. Here's How Lenders Still Get Away with It," Washington Post, February 9, 2015.

58. Often at the table were the attorneys at Rosette, LLP, which holds itself out as "a leading majority Indian owned national law firm representing tribal governments and tribal entities." Rosette, *Our Firm*, https://www.rosettelaw.com/our-firm/ (last visited on March 13, 2022); *see also Hengle v. Asner*, 433 F. Supp. 3d 825, 840 (E.D. Va. 2020) (detailing the role of Rosette in the origin of the tribal lending businesses).

59. Rosette shared Callaway's erroneous legal opinion that loans made through tribal entities did not need to comply with state licensing and usury laws—even when the tribe received only a nominal amount of the proceeds from the loans.

60. Upon information and belief, Rosette has represented the Tribe, including in the creation and implementation of its lending activities.

61. To further advance the pretense of tribal initiative and control, and to protect the non-tribal principals from liability for their illegal conduct, various strategies are typically employed to keep the focus on the tribes and deter consumers from enforcing their rights. Such measures include the adoption of tribal codes and regulations, and sometimes a tribal dispute resolution procedure, used to create the pretense of a legal infrastructure independent from state and federal law.

62. Another central feature of the tribal business model is found in the loan agreements consumers are required to execute as a condition of receiving the unlawful, usurious loans. The loan agreements are typically structured to include a waiver of all state and/or federal rights, in favor of tribal law and dispute resolution provisions. That way, the non-tribal principals running the scheme can claim that they have no liability for their violations of state and federal laws because the loan agreements waive the application of all such law.

63. Like the prior schemes, this tribal lending model is highly problematic for several reasons. Most notably, the loans are aggressively marketed, created, and collected in the state where the consumer resides and thus are subject to the consumer's state licensing and usury laws. *Hengle*, 19 F.4th at 348.

64. Over the past ten years, no less than a dozen courts have considered the enforceability of these loans, each holding that tribal choice-of-law clauses were unenforceable under comparable circumstances and that state law applied. *Id.*[10]

65. During the last decade, federal and state law enforcement agencies have also taken various actions to combat tribal lending schemes, including by example:

a. In 2017, the Justice Department obtained highly publicized criminal convictions under RICO against payday loan kingpins and their attorneys, who had used "rent-a-tribe" arrangements to attempt to evade state usury law. *See United States v. Tucker*, No. 1:16-cr-00091-PKC (S.D.N.Y) (October, 2017 of Scott Tucker and his attorney, Timothy Muir, on all fourteen felony counts brought against them);[11] *United States v. Hallinan*, No. 2:16-cr-00130-ER (E.D.Pa.) (November, 2017 conviction of Charles M. Hallinan and his attorney, Wheeler K. Neff, on seventeen felony counts).[12]

---

[10] *See also, e.g.*, *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 2016 WL 4820635, at *7 (C.D. Cal. Aug. 31, 2016) (holding that "the tribal choice of law provision is unenforceable" because it was "clear that the parties' choice was solely based on CashCall's desire to shield itself against state usury and licensing laws."); *W. Sky Fin., LLC v. State ex rel. Olens*, 793 S.E.2d 357, 366 (Ga. 2016), *reconsideration denied* (Dec. 8, 2016); *Inetianbor v. CashCall, Inc.*, 2015 WL 11438192, at *3 (S.D. Fla. Dec. 8, 2015); *State ex rel. Cooper v. W. Sky Fin.*, LLC, , 2015 WL 5091229, at *10 (N.C. Super. Aug. 27, 2015); *MacDonald v. CashCall, Inc*, No. CV 16-2781, 2017 WL 1536427, at *10 (D.N.J. Apr. 28, 2017), *aff'd*, 883 F.3d 220 (3d Cir. 2018); *Dillon v. BMO Harris Bank, N.A.*, 856 F.3d 330, 336 (4th Cir. 2017); *Hayes v. Delbert Servs. Corp.*, 811 F.3d 666, 675 (4th Cir. 2016); *Rideout v. CashCall, Inc.*, 2018 WL 1220565, at *8 (D. Nev. Mar. 8, 2018).

[11] *See* Press Release, United States Department of Justice, Scott Tucker and Timothy Muir Convicted at Trial for $3.5 Billion Unlawful Internet Payday Lending Enterprise (Oct. 13, 2017) (https://www.justice.gov/usao-sdny/pr/scott-tucker-and-timothy-muir-convicted-trial35-billion-unlawful-internet-payday).

[12] *See* Press Release, United States Department of Justice, Two Men Found Guilty of Racketeering Conspiracy in Payday Lending Case (Nov. 27, 2017) (https://www.justice.gov/usao-edpa/pr/two-men-found-guilty-racketeering-conspiracy-paydaylending-case).

b. The Consumer Financial Protection Bureau and state attorney general offices have filed civil actions against lenders using tribal lending models. *See, e.g., Consumer Fin. Prot. Bureau v. Great Plains Lending, LLC*, 846 F.3d 1049 (9th Cir. 2017) (affirming power of CFPB to investigate tribal lending arrangements), *cert. denied*, 138 S.Ct. 555 (2017); *Commonwealth of Pennsylvania v. Think Fin., Inc.*, No. 14-CV-7139, 2016 WL 183289, at *1 (E.D. Pa. Jan. 14, 2016) (denying motion to dismiss state attorney general action under state RICO statute).

66. In addition, there have been multiple class actions and government enforcement actions that have cancelled billions of dollars of these usurious loans, as well as returned hundreds of millions of dollars to consumers who were victimized by illegal tribal lending enterprises. *Turner v. ZestFinance, Inc.*, No. 3:19-cv-293, Final Approval Order at Dkt. 114 (E.D. Va. July 9, 2020) (granting final approval of a class settlement providing $170 million in debt cancellation and a common fund of $18.5 million); *Gibbs v. Plain Green, LLC*, No. 3:17-cv-495, Final Approval Order at Dkt. 141 (E.D. Va. Dec. 13, 2019) (granting final approval of a class settlement providing $380 million in debt cancellation and a common fund of $53 million); *Galloway v. Williams*, No. 3:19-cv-470, Final Approval Order at Dkt. 115 (E.D. Va. Dec. 18, 2020) (granting final approval of a class settlement providing $100 million in debt cancellation and a common fund of $8.7 million); *Gibbs v. TCV, V, LLP*, No. 3:19-cv-00789, Final Approval Order at Dkt. 95 (E.D. Va. Mar. 29, 2021) (granting final approval of a class settlement providing $383 million in debt cancellation and a common fund of $50 million); *Hengle v. Asner,* No. 3:19-cv-250, Final Approval Order at Dkt. 230 (E.D. Va. Oct. 25, 2022) (granting final approval of a class settlement providing $450 million in debt cancellation and a common fund of $39 million); *Blackburn v. A.C. Israel Enterprises*, Case No. 3:22-cv-146, Final Approval Order at Dkt. 228 (E.D. Va.) (granting final approval of a class settlement creating a common fund of $25.5 million); *Fitzgerald v. Wildcat*, Case No. 3:20-cv-00044 (W.D. Va.), Dec. 17, 2024 Final Approval Order, Dkt. 201

(granting final approval of class settlement providing $1.4 billion in debt cancellation and common fund of $37 million).

67. Despite all the litigation and enforcement efforts, Defendants knowingly aided, abetted, facilitated, and profited from the usurious lending scheme as detailed below.

**D. The Tribe's Usurious Lending Enterprise.**

68. The lending enterprise in this case is just another example of a rent-a-tribe scheme designed to circumvent state usury regulation while taking advantage of vulnerable consumers who are in such dire circumstances that they are willing to accept triple-digit interest rates on relatively small sums just to pay their bills.

***1. Dernier's History with Payday Lending and the Tribe***

69. Since at least 2013, the Tribe and Dernier have partnered to issue high-interest loans under numerous lending fronts.

70. Prior to 2013, Dernier owned and operated Rare Moon Media, LLC, which issued payday loans with interest of 600% or more under various tradenames.

71. Initially, Dernier relied on overseas jurisdictions to attempt to shield his usurious loans from state oversight. For example, Rare Moon's address was listed on the island of Nevis, in the Caribbean, despite being operated out of Missouri. And the loan documents claimed to be subject to only the laws of Nevis, which conveniently did not have any usury protections.

72. Eventually, with the rise of the rent-a-tribe model and increased scrutiny from regulators, Dernier pivoted from an offshore façade to a tribal one.

73. To enact this scheme, in or about 2013, Dernier entered agreements with the Tribe to provide it with a small percentage of the revenue from the usurious loans in return for the Tribe lending its official sanction to Dernier's lending fronts.

74. As part of these agreements, the Tribe, including the Tribal Defendants in their official capacities, chartered several lending entities ostensibly owned and operated by the Tribe, but that were in fact funded, operated, and directed by Dernier. These entities include MB Marketing, Blue Dart Ventures, and Rushmore Financial.

75. Indeed, the Tribe lacks the financial or human capital to support a nationwide, multi-million-dollar lending operation like the one that Dernier spearheaded.

76. The Tribe itself has only 736 members according to the Department of the Interior.[13] This membership, which includes minors, is not sufficient to staff the scale of lending operation that the Tribe claims to own and manage.

77. The Tribe's employment page also lists no job opportunities with any TLE, including 605 Lending.[14] And its Economic Development page does not mention its lending businesses at all, while touting that the Tribe's "investment portfolio" includes "housing development in nearby Sioux Falls, SD, retail shops, Blue Ammonia in West Virginia, and cannabis operations in the state of New York as well as at home."[15] Nor are the lending entities listed under the Tribe's "Enterprises" on the same webpage.

78. 605 Lending's own website and loan documents also provide no actual physical address on the Tribe's reservation or even within South Dakota. And its website is hosted on servers in San Antonio, Texas, thousands of miles from the Tribe's reservation.

79. Based on these facts, and upon other information and belief, instead of receiving meaningful benefits from the lending operation or running the operation itself, the Tribe instead

---

[13] https://www.bia.gov/regional-offices/great-plains/south-dakota/flandreau-santee-sioux-tribe (last visited Aug. 13, 2026).
[14] https://fsst-nsn.gov/employment (last visited Aug. 13, 2026).
[15] https://fsst-nsn.gov/economic-development (last visited Aug. 13, 2026).

merely sanctions the operations of 605 Lending and the other Dernier TLEs on behalf of Dernier and other nontribal participants who fund, design and direct the tribal lending scheme that charges unconscionable interest rates in violation of state usury and licensing laws.

80. These nontribal coconspirators include Defendants Dernier, Christensen, and Infinity, as well as their yet-to-identified owners, officers, and investors, who are the true drivers of 605 Lending's operations.

81. To engage in this extremely profitable, but illegal business, Dernier, 605 Lending, and the deliberately concealed nontribal coconspirators have entered into agreements with the Tribe, Defendants, and others to make and collect on usurious loans in states across the country, including in Illinois, and to keep their identity hidden from consumers and regulators.

***2. Dernier, the Tribal Defendants, 605 Lending, and Christensen Start the Usurious Lending Enterprise***

82. In or around 2017, Dernier partnered with the Tribe to charter FSST Management Services, which is corporation behind 605 Lending. Defendant Reider—the Tribe's President—is also president of FSST Management Services, and Defendant Weddell also serves as FSST's Management Service's vice president. However, the day-to-day operations of FSST Management Services are handled by Defendant Christensen, who is the COO of the company, and Defendant Dernier, who is the CEO.

83. Upon information and belief, Christensen was recruited by Dernier to manage the day-to-day operations of 605 Lending alongside him, while Reider and Weddell serve nominal roles at the company designed to bolster its appearance of being tribally run.

84. With the Tribal Defendants' sanction and support, Dernier then shifted his existing payday operations into 605 Lending, whose website was created the same year as FSST Management Services (2017).

85. Another of Dernier's lending fronts ostensibly owned by the Tribe, Rushmore Financial, also began directing users to 605 Lending's website that same year to obtain loans.

86. Thus, since at least 2017, the Tribal Defendants, Dernier, and Christensen have partnered together to charter, manage, and operate FSST Management Services and its lending front, 605 Lending, as well as, other lending entities associated with the Tribe.

87. Under this structure, the Tribal Defendants and FSST Management Services, at Reider's, Weddel's, and Christensen's direction, provide the tribal façade for 605 Lending and Dernier's other lending fronts, while Dernier and his non-tribal investors and partners provide the necessary financial and human capital—as well as the technological and industry knowhow—to actually issue and collect the usurious loans.

88. Both sides (the Tribal Defendants, on the one hand, and Dernier and the Non-Tribal Defendants, on the other) mutually benefit from this arrangement: the Tribe gives 605 Lending the necessary tribal sanction to claim sovereign immunity and the (now disproven) right to evade state usury protections, while 605 Lending, Dernier, Christensen, and their non-tribal coconspirators provide the Tribe with a share of the revenues—albeit a small percentage.

### *3. Infinity Knowingly Joins and Grows the Usurious Lending Enterprise*

89. To carry out their end of the bargain, 605 Lending, Dernier and Christensen have in turn recruited yet-to-be-identified investors to provide the capital to fund the loans and keep the TLEs running. They have also recruited Defendants Infinity and Lead Bank to provide the end-to-end functional support for the lending operation and the ACH processing necessary to collect payments on the loans.

90. Infinity—a Nevada company—provides software to underwrite, service, and collect on the high-interest debts issued by 605 Lending.

91. Infinity's website brags that its software "is an advanced, powerful, and end-to-end lending solutions designed for short-term lenders."[16]

92. Its software includes tools for loan origination, automation of loan processing and underwriting, and borrower screening, as well as payment and collections.[17]

93. Upon information and belief, Dernier and 605 Lending entered into agreements with Infinity in or around 2017 for the purposes of providing the software support necessary for 605 Lending to operate.

94. Indeed, Infinity's own website proudly displays a 5-star review from Dernier, who is identified as 605 Lending's CEO:[18]




95. As Dernier's review concedes, Infinity "helped us grow our start up [i.e., 605 Lending] into something to be very proud of" and was "there for us every step of the way."

---

[16] https://infinitysoftware.com/ (last visited Aug. 13, 2026).
[17] https://infinitysoftware.com/solutions (last visited Aug. 13, 2026).
[18] https://infinitysoftware.com/about (last visited Aug. 13, 2026).

96. Since partnering with Dernier and his company, 605 Lending, Infinity has provided the technological tools necessary for 605 Lending to continue to issue, underwrite, fund, and collection on its usurious loans. Upon information and belief, Infinity's website server also used to host 605 Lending's website, as well, confirming the company's central role in 605's operations.

97. As a wholly online lender, 605 Lending would not be able to operate without Infinity's support and software. In other words, none of the loans issued to Plaintiffs and the class members would have been possible without Infinity's participation in the scheme.

98. Upon information and belief, in return for providing the software to support Dernier's operation, Infinity received a share of the revenues from 605 Lending's portfolio.

99. At the time it joined the lending conspiracy, Infinity was aware of the shared objective of the conspiracy to make and collect on clearly usurious loans under the auspices of a rent-a-tribe scheme. Indeed, Infinity specifically markets to tribal lenders like 605 Lending with a "tribal approval module" that allows Tribes to claim to be the originator of the loan while in reality preapproving the loans through its automated system without the Tribe needing to make a decision.

100. Upon information and belief, Infinity was also aware of Dernier's reputation within the payday lending industry, including his history with high-interest loans, at the time it entered into agreements with him and his coconspirators to provide the necessary support for 605 Lending. And given its integral role in 605 Lending's development—as professed by Dernier—Infinity at the very least became aware of the nature of 605's loans shortly after agreeing to assist the company and nonetheless continued to aid and abet the operation, allowing it to—in Dernier's own words—"grow . . . into something to be very proud of."

### *4. Infinity Knowingly Joins and Grows the Usurious Lending Enterprise*

101. In addition to Infinity, Dernier, Christensen, 605 Lending, and their coconspirators have also partnered with Lead Bank to fulfill another critical function for 605 Lending: processing of ACH and debit card transactions to collect payments on the loans.

102. As recently as 2023, Lead Bank specifically advertised its services to "those industries and people that have traditionally experienced a more challenging time accessing traditional banking services, like payment processing solutions." It claims to "specialize in working with online lenders, state licensed lenders, tribal entities, third party payroll processors, money service businesses and others."

103. Like Infinity, as recently as 2023, its website also contained a testimonial from Dernier, who described Lead Bank's payment processing services as "an asset for our business."

104. Lead Bank is indeed an asset to 605 Lending. Starting in 2013, the federal government began cracking down on internet lenders through the banks that processed internet loan payments, holding them vicariously liable for the high-interest loans. In response, most large banks stopped transactions with known internet lenders.

105. As other smaller banks also refused internet loan transactions, lenders like 605 had to turn to middlemen to conceal the true nature of the loan payments and allow for automated debiting from borrowers' accounts—a critical source of consistent and predictable income for the company.

106. In stepped Lead Bank to address this need among internet lenders by offering to process payments through its access to the ACH network, while taking a large percentage of each transaction as a fee, typically between 2 and 10% of the total dollar amount (which is far higher

than the usual percentage of 5 or 10 cents per ACH transaction that low-risk businesses are charged).

107. Upon information and belief, since at least 2017, pursuant to written agreements executed by 605 Lending, Dernier, and Christensen, Lead Bank has processed the ACH transactions that allow 605 Lending to automatically collect payments from borrower bank accounts. This function is essential to 605's success and the overall profitability of the lending enterprise. Without Lead Bank's participation, Defendants would be unable to collect on the loans issued by 605 Lending in an efficient and profitable manner.

108. Lead Bank has been fully aware of the nature of 605 Lending's business since it joined the conspiracy in 2017. As an Original Depository Financial Institution within the National Automated Clearing House Association's ACH system, Lead Bank is required to gather detailed information on the businesses for whom it uses the ACH network, including 605 Lending. Through the information it gathered on 605 Lending, Lead Bank understood that its payment processing services were being used to collect on loans with triple-digit interest rates that were clearly usurious and void in nearly every state. Nonetheless, it continued to aid and abet the lending operation in exchange for a share of the revenues.

***5. Defendants Knowingly Facilitate and Manage a Usurious Lending Scheme Designed to Evade State Usury Protections***

109. Despite their awareness of their unlawful and unethical lending practices, Defendants continue to oversee, operate, and facilitate 605 Lending's usurious lending operations.

110. Upon information and belief, 605 Lending and the other Tribal Lending Entities operate under the oversight of the Tribal Defendants and Defendant Christensen, without whose approval and legal sanction 605 Lending or the other TLEs could not operate.

111. The Tribal Defendants, Christensen, Infinity, and Lead Bank continue to facilitate the illegal lending scheme by allowing 605 Lending to make and collect on usurious and void loans in multiple jurisdictions, including Illinois and Florida. And Dernier provides the overall leadership for the scheme, entering the necessary arrangements on behalf of 605 Lending to continue its operations.

112. Upon information and belief, none of the Defendants have applied for a consumer lending license any state with such laws.

113. Defendants' attempts to evade state usury protections also extend to the form 605 Lending consumer loan agreements, which prospectively waive the application of all state laws, including those that could challenge the application of the Tribe's laws under the choice-of-law provision, stating, *inter alia*, that only "applicable federal law and the tribal and substantive law of the [Tribe]" shall govern all disputes. And the Governing Law provision further states that the contract "shall not be interpreted to mean that the State of South Dakota or any other state has lawful authority to regulate the Business or any activities of the Lender or its officers, employees, or agents, or this Agreement."

114. As such, the form agreements purport to strip consumers like Plaintiffs of the right to challenge the application of the Tribe's laws to their loans under the public policy and laws of their own states of residence, including Illinois and Florida, which have a long and robust history of precluding usurious lending operations like 605 Lending's that burden their citizens with insurmountable debts.

115. Further, the consumer loan agreement includes a mandatory "dispute resolution procedure" available to a consumer for any claims.

116. Notably, this dispute resolution procedure only applies to a consumer's complaint, and 605 Lending is not restricted in the manner of enforcement of the agreement against a consumer.

117. In addition to only applying to consumers' claims, the dispute resolution procedure requires consumers to first file complaints with 605 Lending for an investigation and response.

118. If a consumer is unhappy with the result of 605 Lending's investigation, a consumer can then pursue arbitration, but the arbitrator can apply only the laws of the Tribe and "applicable federal law." The arbitrator could not consider any possible state law defenses to enforcement of the loan agreement, including that the agreement's selection of tribal law to the exclusion of state law violates the state's public policy against unlicensed usurious lending. As such, the agreement prospectively waives any right of consumers like Plaintiffs and others in states with usury regulations to challenge the choice-of-law provision that exclusively selects the law of the Tribe.

119. Similarly, while the agreement purports to require arbitration of all common law and statutory claims, including state law claims, it precludes arbitrators from ever applying the law of any state to determine those claims, including in instances where the law of the state applies regardless of any choice of law provision. And in the same vein, it also precludes the application of any state defenses to arbitrability, as those would necessarily require the application of state law that the agreement expressly prohibits. As such, the arbitration provision in the form agreement is wholly unenforceable.

**E. 605 Lending is Not Entitled to Tribal Sovereign Immunity**

120. 605 Lending's form loan agreements also claim that the lender is entitled to tribal sovereign immunity as an arm of the Tribe. But this, too, is a deception aimed at dissuading consumers from asserting their rights under state law, including state usury protections.

121. Just this year, in *Galette v. N.J. Transit Corp.*, the Supreme Court ruled in an analogous case that the New Jersey Transit Authority was not an arm of the state that could share in New Jersey's sovereign immunity. 607 U.S. 509, 536 (2026).

122. The Supreme Court evaluated three factors to determine whether NJ Transit was an arm of New Jersey, subject to the protection of sovereign immunity. First, they asked whether New Jersey structured NJ Transit as a legally separate entity from the State. *Id.* at 528-29. Second, the Supreme Court assessed whether the State was formally liable for NJ Transit's debts or liabilities. *Id.* at 529-30. Finally, they weighed the control New Jersey exerted over NJ Transit. *Id.* at 530. Separately, the Court analyzed whether New Jersey was a real party in this case, which could provide a separate basis for dismissal through sovereign immunity. *Id.* at 527.

123. As in *Galette*, these factors demonstrate that 605 Lending is not entitled to tribal sovereign immunity as it claims in its loan agreements.

124. First, 605 Lending, like the Transit Authority in *Galette*, is structured as a separate entity from the Tribe. In *Galette*, rather than focusing on whether the legislature labeled an entity as an "instrumentality" of the State, the Supreme Court guided their inquiry through an examination of the legal characteristics of the entity. *Id.* at 529. There, the clearest indication that a State intended to create a le2y separate entity was its creation of a corporation with "traditional corporate powers:" to sue and be sued, to hold property, to draft and sign contracts, and to incur debt. *Id.* at 524. This is exactly the Tribe created 605 Lending.

125. Indeed, the Tribe's Lending and Consumer Protection Act explicitly defines "Lender" as a "tribal entity approved by the Tribal Executive Committee that (1) regularly makes consumer loans, (2) extends, renews, or continues credit, (3) regularly arranges for the extension,

renewal, (4) [sic] or continuation of credit, or [4] any assignee of the original creditor who participates in the decision to extend, renew, or continue credit."[19] § 28-2-1(j).

126. In other words, the Tribe itself contemplates that each TLE will act as a business: entering contracts, holding property (i.e., money), and interacting with consumers.

127. The loan agreements themselves also contemplate that each TLE can sue and be sued, even stating that any arbitration award is subject to confirmation in a United States District Court. In other words, 605 submits to both an arbitral forum and the jurisdiction of federal courts for purposes of resolving disputes between it and consumers.

128. To remove any doubt, the Tribe's Lending Act specifically states that each TLE "is deemed to have consented and submitted to the jurisdiction of the [Tribe]." § 28-3-3(a). But if the TLEs were already a true arm and instrumentality of the Tribe, they would not need to be "deemed to have consented and submitted" to the Tribe's jurisdiction; that would be a given.

129. And the Act states that lending entities are formed under either Title 25 or Title 27 of the Tribal Code. Tribal Code § 28-3-3(c). Of those, Title 27 addresses the formation of LLCs by the Tribe, such as 605 Lending, and states that the purpose of the Title is to, in relevant part, allow "Tribal business entities" to "manag[e] the Tribe's non-gaming economic activities *separate from the general affairs of its Executive Committee*, with the ability to enter into legally-binding contracts and commercial relationships *without the need for formal Executive Committee action*." § 27-1.2(B)(2) (emphasis added).[20]

---

[19] https://fsst-nsn.gov/hubfs/44.-Title-28-Tribal-Lending-and-Consumer-Protection-Act.pdf?hsLang=en (last visited Aug. 14, 2026).
[20] https://fsst-nsn.gov/hubfs/43.-Title-27-Limited-Liability-Company-Code.pdf?hsLang=en (last visited Aug. 14, 2026).

130. Title 27, which Plaintiffs incorporate and re-allege in full as part of this Complaint, then proceeds to outline the obligations and powers of tribally-formed LLCs such as 605 Lending, stating that each LLC formed by the Tribe "*has the same powers as an individual to do all things necessary and convenient to carry out its business*, including but not limited to the following:

(A) Consent to be sued, complain and defend in its name; provided, however, that if an LLC is Tribally-owned, or wholly-owned by another entity which itself is wholly-owned by the Tribe, it shall be entitled to and shall enjoy the Tribe's sovereign immunity from suit unless the Operating Agreement otherwise provides.

(B) Purchase, take, receive, lease, or otherwise acquire and own, hold, improve, use, and otherwise deal in or with real, or personal property or any legal or equitable interest in real or personal property, wherever situated.

(C) Sell, convey, mortgage, pledge, create a security interest in, lease, exchange, or otherwise dispose of all or any part of its property.

(D) Lend money, property, and services to, and otherwise assist its Members and Managers, if any.

(E) Purchase, take, receive, subscribe for, or otherwise acquire and own, hold, vote, use, employ, sell, mortgage, lend, pledge, or otherwise dispose of and deal in and with shares or other interests in, or obligations of, any other enterprise or entity.

(F) Make contracts and guarantees; incur liabilities; borrow money; issue notes, bonds, and other obligations; and secure any of its obligations by mortgage or pledge of all or part of its property, franchises, and income.

(G) Lend money, invest and reinvest its funds, and receive and hold real or personal property as security for repayment.

(H) Conduct its business, locate offices, and exercise the powers granted by this Code inside or outside of the Reservation.

(I) Be a promoter, incorporator, partner, Member, associate, or Manager of any enterprise or entity.

(J) Elect or appoint Managers, agents, and employees, define their duties, and fix their compensation.

(K) Pay pensions and establish pension plans, pension trusts, profit-sharing plans, and benefit or incentive plans for any or all of its current or former Members, Managers, employees, and agents.

(L) Make donations to and otherwise devote its resources for the public welfare or for charitable, scientific, educational, humanitarian, philanthropic, or religious purposes.

(M) Indemnify a Member, Manager, employee, officer or agent, or any other person.

(N) Provide benefits or payments to Members, Managers, employees, and agents of the LLC, and to their estates, families, dependents or beneficiaries in recognition of the past services of the Members, Managers, employees, and agents of the LLC.

(O) Make payments, or do any other act not prohibited by law, that furthers the business of the LLC.

(P) Transact any lawful business that the Members or the Managers find to be appropriate to promote and further the business and affairs of the limited liability company.

Tribal Code § 27-1.09.

131. Put simply, the Tribal law under which 605 Lending was purportedly formed empowers 605 Lending to act and carry out the functions and responsibilities of any private LLC or individual conducting business. This is precisely the substantive, corporate powers that the Supreme Court unanimously held in *Galette* rendered the Transit Authority subject to private suit.

132. 605 Lending's contrary claims of sovereign immunity do not overcome its substantive function as a private business. The Supreme Court rejected the same argument in *Galette*, stating that the Transit Authority's use of the title "instrumentality" to claim sovereign immunity, even if also used by the State, did not control over the actual form and functions of the Authority. 607 U.S. at 529. So too here; 605 Lending acts like a regular LLC and talks like a regular LLC, so it is an LLC capable of being sued.

133. The second and third factors under *Galette* also defeat 605 Lending's claims of sovereign immunity. The second factor asks whether the sovereign is formally liable for the instrumentality's debts and obligations. For this factor, the Title 27 of the Tribe's Code again provides the explicit answer, stating: "The debts, obligations, and liabilities of an LLC, whether arising in contract, tort, or otherwise, *shall be solely the debts, obligations, and liabilities of the LLC*." Tribe Code § 27-2.5 (emphasis added). The Tribe and its treasury are thus never liable for any of the debts or obligations incurred by 605 Lending. As in *Galette*, this again confirms that 605 Lending is not entitled to claim the Tribe's sovereign immunity.

134. The third factor asks the degree of control the sovereign exerts over the instrumentality claiming immunity. Although courts may consider this factor, the Supreme Court emphasized that it is "not especially probative because 'ultimate control of every state-created entity resides with the State,' *even those that are not arms of the State*." 607 U.S. at 526 (quoting *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30, 47 (1994) (emphasis added). The mere fact that board members or other directors of the entity may be subject to government approval, for example, is not sufficient to transform an otherwise separate entity into an arm of the State. *See id.* Nor is it sufficient that the sovereign has formal oversight of the entity through its power to dissolve it. *See id.*

135. The same factors weigh against 605 Lending here. Although ultimately subject to the Tribe's authority, as detailed above, the Tribe itself is not involved in the day-to-day operations of 605 Lending.

136. And finally, the Tribe is not the real party in interest. This factor assumes that the instrumentality can otherwise be sued and simply asks whether the sovereign is the nonetheless party that will bear the legal consequences of the judgment and thus warrant dismissal. But the

Tribe is not the real party in interest in this case, where Plaintiffs are seeking monetary damages from 605 Lending and the Non-Tribal Defendants, whose debts and obligations are explicitly their own and not the Tribe's, and where the Tribal Officials are sued only for injunctive relief in their official capacities. It is also relevant that the Tribe receives only a minimal, single-digit percentage of the revenues from 605 Lending's operations, so the Tribe would not bear the primary consequences of any judgment.

137. For at least these reasons, therefore, 605 Lending is subject to suit in this case for monetary, injunctive, and declaratory relief.

**F. Plaintiffs' Experience and Loan Histories.**

138. Because of the ostensible protections created by the tribal business model, the interest rates charged on the loans were more than 20 to 75 times the amount permitted by state usury and licensing laws.

139. For example, Plaintiff Morris Bias applied for and obtained five, small-dollar loans from 605 Lending between May 2024 and July 2025 from his home in Illinois, which had a minimum interest rate of 738%, far exceeding Illinois' 36-percent interest rate cap. Mr. Bias made payments on each of these loans and paid back more than he borrowed on each of the loans.

140. From his home in Florida, Plaintiff Clarence Knox applied for and obtained two loans from 605 Lending in March 2025 and March 2026, which had a minimum interest rate of 546%, far exceeding Florida's18-percent cap. Using his bank account maintained in Florida, Mr. Knox paid back more than he borrowed on these loans.

141. Upon information and belief, none of the Defendants, nor the Tribe, the Tribal Defendants, or the Tribal Lending Entities has ever obtained a license to issue loans to consumers

in any state, including Plaintiffs' states of residence, let alone a license to issue the triple-digit interest loans to Plaintiffs and the putative class members.

142. Plaintiffs all applied for their loans on the internet while located in their respective states of residence. None of the Plaintiffs traveled to the Tribe's reservation to obtain their loans.

143. Plaintiffs all used their home addresses when applying for the loans, and they used bank accounts maintained in their home states to receive the loans and for the subsequent ACH debits used to pay down the loans.

144. As outlined above, the loans issued to Plaintiffs violated the respective usury statutes of each of their home states and entitle Plaintiffs to the remedies provided under those states' laws, including avoidance of the loans, repayment, at a minimum, of interest paid above the usury caps, if not principal and interest entirely, as well as exemplary damages.

145. Similarly, almost all other state jurisdictions treat as illegal unlicensed small loans like those involved here.[21]

---

[21] Most states recognize a similar public policy against usury and have adopted similar laws addressing high-interest loans. *See* Ala. Code § 5-18-4 (loans made without a license "shall be void"); Alaska Stat. § 06.20.310; Ariz. Rev. Stat. § 6-613(B) (loans that charge illegal finance charges are "voidable"); Ark. Code §§ 4-57-104, 105; Cal. Fin. Code §§ 22303, 22750; Colo. Rev. Stat. Ann. § 5-2-201; Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); Conn. Gen. Stat. § 36a-558 (c)(1) (loans made without a license are "void" and uncollectable); D.C. Code §§ 26-905, 28-3303; Fla. Stat. § 516.02 (loans made with excessive interest rates are "not enforceable"); Ga. Code § 16-17-3 (loans made without a license "shall be void ab initio"); Haw. Rev. Stat. § 478-4; Idaho Code § 28-46-402 (payday loans made without a license are "void, uncollectable and unenforceable"); 815 Ill. Comp. Stat. 122/4-10 (payday loans made without a license "shall be null and void"); Kan. Stat. § 16a-5-201; Ky. Rev. Stat. Ann. § 286.4-991 (loans made without a license are void); La. Stat. Ann. § 9:3552; Me. Rev. Stat. tit. 9-A, § 2-401; Mass. Gen. Laws Ann. ch. 140, § 110 (small loans made without a license are void); Md. Code, Com. Law § 12-314 (small loans made without a license that charge excessive interest rates are "unenforceable"); Mich. Comp. Laws §§ 438.32, 445.1854; Minn. Stat. §§ 47.60, 47.601 (provisions in loan contracts charging excessive interest rates are void and unenforceable); Minn. Stat. § 56.19 (authorizing debtor to recover all amounts paid on loans made in violation of licensing requirements); Miss. Code. § 75-67-119; Mont. Code § 31-1-712 (Any deferred deposit loan made by an unlicensed lender "is void, and the unlicensed person may not directly or indirectly collect,

146. Despite the nearly universal prohibition against unlicensed, high-rate, small-loan lending, Defendants knowingly participated in a widespread scheme to make and collect the loans at issue in this case, which have victimized hundreds of thousands of consumers on terms similar to Plaintiffs.

## COUNT ONE:
## VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)
## (CLASS CLAIM AGAINST THE NON-TRIBAL DEFENDANTS FOR DAMAGES AND 605 LENDING AND THE TRIBAL DEFENDANTS IN THEIR OFFICIAL CAPACITIES FOR INJUNCTIVE RELIEF)

147. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

148. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "RICO Damages Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with 605 Lending; (2) from Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, Wisconsin or Wyoming; and (3) paid back more than they borrowed on their loan.

---

receive, or retain any loan principal, interest, fees, or other charges related to the loan"); Neb. Rev. Stat. § 45-1024; N.H. Rev. Stat. § 399-A:23 (any contract for small loan by unlicensed lender is "null and void"); N.M. Stat. § 58-15-3 (small loans made without a license are void); N.Y. Gen. Oblig. Law § 5-511 (usurious loans are "void"); N.Y. Banking Law § 355; N.C. Gen. Stat. § 53-166 (small loans made without a license are void); N.D. Cent. Code § 13-04.1-09.3 (West); Ohio Rev. Code Ann. § 1321.02 (small loans made without a license are void); Okla. Stat. tit. 14A, § 3-201; Or. Rev. Stat. § 725.045 (consumer finance loans made without a license are "void"); 41 P.S. §§ 501-502; 6 R.I. Gen. Laws § 6-26-4 (loans charging excessive interest "shall be usurious and void"); S.C. Code § 34-29-140; S.D. Codified Laws § 54-4-44 (loans charging excessive interest or made without a license are "void and uncollectible"); Tenn. Code §§ 47-14-110, 117; Tx. Fin. §§ 302.001-004; Vt. Stat. tit. 9, § 50; Va. Code § 6.2-1541(any loan made in violation of Virginia's usury and licensing laws "shall be void" and "any principal or interest paid on the loan shall be recoverable by the person by or for whom payment was made"); Wash. Rev. Code § 19.52.020; W. Va. Code § 46A-5-101; Wis. Stat. § 138.14; Wyo. Stat. § 40-14-521.

All Plaintiffs are members of this class.

149. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "RICO Injunctive Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with 605 Lending; (2) from Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, Wisconsin or Wyoming.

All Plaintiffs are members of this class.

150. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by 605 Lending and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

151. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew of and facilitated the conspiracy to collect the loans; and (5) whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

152. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

153. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

154. Defendants are each a "person" as that term is defined in 18 U.S.C. § 1964(3).

155. Defendants, along with the Tribe and others, were and continue to be members and associates of an internet lending association-in-fact that will be referred to hereafter as the "Usurious Lending Enterprise" or "the Enterprise."

156. The Usurious Lending Enterprise, including its leadership, membership, and associates, constitutes an "enterprise" as that term is defined in 18 U.S.C. § 1961(4)—that is, a group of individuals and entities associated in fact.

157. The members and associates of the Usurious Lending Enterprise shared various common purposes, including the evasion of state usury and licensing law, the operation of the 605 Lending website, the processing of applications from consumers across the United States, the collection of payments from borrowers, and the division of generated revenues in accordance with written agreements.

158. The Usurious Lending Enterprise assigned specific roles to the members and associates. Dernier and Christensen designed and directed the Enterprise, and Infinity and Lead Bank provided necessary support functions without which the operation could not continue. The Tribal Defendants established and organized the tribal façade for the Enterprise and to take various measures designed to reinforce the fiction that the Enterprise is a tribal-run business. And all Defendants shared the revenues of the Enterprise in accordance with written agreements.

159. The Usurious Lending Enterprise has had a longevity sufficient to originate and collect tens of thousands of illicit loans. It has existed since at least 2017, with precursors even before that.

160. The Usurious Lending Enterprise has been engaged in, and its activities affected, interstate commerce. The Tribal Defendants perform their roles from the tribal lands in South Dakota but the John Doe and Non-Tribal Defendants who are operating the Enterprise do so from locations in other states. The Enterprise sends loan proceeds into and collects payments from locations throughout the United States, including Illinois and Florida.

161. RICO defines "unlawful debt" as a debt which was incurred in connection with "the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

162. Defendants violated § 1962(c) of RICO, 18 U.S.C. § 1962(c), by participating, directly or indirectly, in the conduct of the Enterprise's affairs in the collection of unlawful debt.

163. All of the loans made to Class members and collected by Defendants and Defendants' co-conspirators included interest rates far in excess of twice the enforceable rate in their states.

164. As alleged, each of Defendants participated in the collection of unlawful debt.

165. Plaintiffs and the RICO Damages Class members were injured as a direct result of Defendants' violations of 18 U.S.C. § 1962(c) by, among other things, the payment of unlawful debt to the Enterprise, which money transfers would not have been made but for Defendants' conduct.

166. Additionally, Plaintiffs and the RICO Injunctive Class members will be irreparably harmed absent an injunction prohibiting the continued collection and attempted collection of the illegal loans, including ongoing harm to their credit capacities and eligibility for credit.

167. Accordingly, the Non-Tribal Defendants are jointly and severally liable in their individual capacities to Plaintiffs and the RICO Damages Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

168. Plaintiffs further seek an injunction against 605 Lending and/or the Tribal Defendants, in their official capacities, to prevent the continued collection or attempted collection of the disputed debts from the RICO Injunctive Class pursuant to 18 U.S.C. § 1964 and *National Organization for Women, Inc. v. Scheidler*, 267 F.3d 687 (7th Cir. 2001).

## **COUNT TWO:**
## **VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)**
## **(CLASS CLAIM AGAINST THE NON-TRIBAL DEFENDANTS FOR DAMAGES AND 605 LENDING AND THE TRIBAL DEFENDANTS IN THEIR OFFICIAL CAPACITIES FOR INJUNCTIVE RELIEF)**

169. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

170. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of the RICO Damages Class and RICO Injunctive Class in Count One.

171. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and

addresses of the class members are identifiable through the internal business records maintained by 605 Lending and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

172. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the relationship between the various participants constitutes an enterprise as defined under RICO; (4) whether Defendants knew of and facilitate the conspiracy to collect the loans; and (5) whether the amounts paid by each consumer are recoverable against Defendants. These questions predominate over the questions affecting only individual class members.

173. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

174. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

175. Defendants violated § 1962(d) of RICO, 18 U.S.C. § 1962(d), by conspiring to violate § 1962(c).

176. Defendants each knowingly agreed to participate in the scheme alleged herein that allowed the Enterprise to make and collect unlawful debt at more than twice the lawful rate of interest under state usury laws.

177. Plaintiff and the RICO Damages Class members were injured as a result of Defendants' violations of 18 U.S.C. § 1962(d) and are entitled to treble their actual damages, which would include any interest, fees, or other sums collected by the Enterprise.

178. Additionally, Plaintiffs and the RICO Injunctive Class members will be irreparably harmed absent an injunction prohibiting the continued collection and attempted collection of the illegal loans, including ongoing harm to their credit capacities and eligibility for credit.

179. Accordingly, the Non-Tribal Defendants are jointly and severally liable in their individual capacities to Plaintiffs and the RICO Damages Class for their actual damages, treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1964(c).

180. Plaintiffs further seek an injunction against 605 Lending and/or the Tribal Defendants, in their official capacities, to prevent the continued collection or attempted collection of the disputed debts from the RICO Injunctive Class pursuant to 18 U.S.C. § 1964 and *National Organization for Women, Inc. v. Scheidler*, 267 F.3d 687 (7th Cir. 2001).

## COUNT THREE:
## UNJUST ENRICHMENT
## (CLASS CLAIM AGAINST THE NON-TRIBAL DEFENDANTS)

181. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

182. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this action for themselves and on behalf of a class—the "Unjust Enrichment Class"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with 605 Lending; (2) from Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, Wisconsin or Wyoming; and (3) repaid more than the principal balance of the loans.

Plaintiffs are members of the Unjust Enrichment Class.

183. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Bias brings this claim for himself and the following subclass—the "Illinois Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with 605 Lending; (2) from Illinois, and (3) repaid more than the principal balance of the loans.

Plaintiff Bias is a member of this subclass.

184. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Knox brings this action for himself and the following subclass—the "Florida Unjust Enrichment Subclass"—initially defined as:

> All natural persons who: (1) entered into a loan agreement with 605 Lending; (2) from Florida, and (3) repaid more than the principal balance of the loans.

Plaintiff Knox is a member of this subclass.

185. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained

by 605 Lending and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

186. **<u>Predominance of Common Questions of Law and Fact</u>. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether Plaintiffs and the class members conferred a benefit on Defendants; (4) whether Defendants knew or should have known of the benefit; (5) whether Defendants retained an unjust benefit because the loan was void; and (6) what is the proper recovery for Plaintiffs and the class members against each of Defendants.

187. **<u>Typicality</u>. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

188. **<u>Adequacy of Representation</u>. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

189. As detailed above, all loans to Virginia, Indiana, Wisconsin, Alabama, Alaska, Arizona, Arkansas, California, Colorado, Connecticut, District of Columbia, Florida, Georgia,

Hawaii, Idaho, Illinois, Kansas, Kentucky, Louisiana, Maine, Massachusetts, Maryland, Michigan, Minnesota, Mississippi, Montana, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Vermont, Virginia, Washington, West Virginia, or Wyoming were unenforceable.

190. Plaintiffs and the class members conferred a benefit on Defendants when they repaid the void loans; Defendants knew or should have known of the benefits; and Defendants have been unjustly enriched through their receipt of any amounts in connection with the unlawful loans.

191. Accordingly, on behalf of themselves and the class defined above, Plaintiffs seek to recover from Defendants, jointly and severally, all amounts repaid on any loans issued by 605 Lending beyond the principal balances issued to each class member.

**COUNT FOUR**
**Declaratory Judgment Under 28 U.S.C. § 2201**
**(CLASS CLAIM AGAINST 605 LENDING AND/OR THE TRIBAL DEFENDANTS IN THEIR OFFICIAL CAPACITIES)**

192. Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

193. Pursuant to Rule 8(d)(2), Plaintiffs allege that, in the alternative to the prospective relief available under state law, a declaratory judgment is available under 28 U.S.C. § 2201.

194. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs bring this claim for themselves and on behalf of the "Void Debt Class" initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with 605 Lending; (2) from Alabama, Arizona, Arkansas, California, Connecticut, Florida, Georgia, Idaho, Illinois, Kansas, Maryland, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, Virginia, West Virginia, or Wisconsin; and (3) have an outstanding balance on their loan.

Plaintiffs are members of this class.

195. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Bias brings this claim for himself and on behalf of a subclass initially defined as follows (the "Illinois Void Debt Subclass"):

> All natural persons who: (1) entered into a loan agreement with 605 Lending; (2) from Illinois; and (3) has an outstanding balance on their loan.

Plaintiff Bias is a member of this subclass.

196. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Knox brings this claim for himself and on behalf of a subclass initially defined as follows (the "Florida Void Debt Subclass"):

> All natural persons who: (1) entered into a loan agreement with 605 Lending; (2) from Florida; and (3) has an outstanding balance on their loan.

Plaintiff Knox is a member of this subclass.

197. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by 605 Lending and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

198. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate each state's usury laws; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the loans are usurious and/or made without a license under the respective state laws

governing the loans; (4) whether the loans are void under the respective state laws governing the loans; and (5) whether Plaintiffs are entitled to declaratory relief.

199. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative classes. All are based on the same facts and legal theories.

200. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative classes because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

201. Alabama, Arizona, Arkansas, California, Connecticut, Florida, Georgia, Idaho, Illinois, Kansas, Maryland, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, Virginia, West Virginia, and Wisconsin have licensing or usury laws that require a lender to be licensed and/or cap interest rates.

202. None of the Defendants were licensed to make loans in Alabama, Arizona, Arkansas, California, Connecticut, Florida, Georgia, Idaho, Illinois, Kansas, Maryland, Minnesota, New York, Oregon, Rhode Island, South Dakota, Texas, Virginia, West Virginia, or Wisconsin.

203. Because the loans were made without the required license and/or charged excessive interest rates, the loans are null and void.

204. Plaintiffs and members of the classes are subject to ongoing harm absent a declaration that the loans were void, including the accumulation of additional debt, adverse credit reporting of the invalid loans, and abusive collection practices.

205. The dispute and controversy is a justiciable matter that is not speculative, and a resolution by this court will determine the rights and interests of the parties to the loan contracts as well as the validity, if any, of the choice of law and forum-selection provisions.

206. Pursuant to 28 U.S.C. § 2201, there is an actual justiciable controversy, and a declaratory judgment is the appropriate mechanism for resolving the validity and enforceability of the loan agreements.

207. Accordingly, Plaintiffs seek a declaratory judgment that the loan agreements are void and invalid and the loans of the Void Debt Class and subclass members are uncollectable. Plaintiffs also seek to enjoin 605 Lending and/or the Tribal Defendants, in their official capacity, from allowing collection on the loans.

**COUNT FIVE**
**Illinois Interest Act, 815 ILCS § 205/6**
**(CLASS CLAIM BY PLAINTIFF BIAS AGAINST THE NON-TRIBAL DEFENDANTS FOR DAMAGES)**

208. Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

209. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Bias brings this claim for himself and on behalf of a class initially defined as follows:

> All natural persons who: (1) entered into a loan agreement with 605 Lending; (2) from Illinois; and (3) made at least one payment on the loan.
>
> Plaintiff Bias is a member of this class.

210. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by 605 Lending and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

211. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate the Illinois Interest Act; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the loans are usurious under Illinois law; (4) whether the loans are void under Illinois law; and (5) whether Plaintiffs and the class members are entitled to damages.

212. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff Bias's claims are typical of the claims of each putative class member. In addition, Plaintiff Bias is entitled to relief under the same causes of action as the other members of the putative classes. All are based on the same facts and legal theories.

213. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff Bias is an adequate representative of the putative classes because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; he has retained counsel competent and experienced in such litigation; and he has and intends to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

214. Under the Illinois Interest Act, the parties to a written contract may "stipulate or agree to an annual percentage rate of 9%." 815 ILCS § 205/4.

215. Further, "[n]o person shall directly or indirectly accept or receive, in money, goods, discounts or things in action, or in any other way, any greater sum or greater value for the loan . . . than is expressly authorized by this Act or the laws of this State." 815 ILCS § 205/5.

216. The loans issued to Plaintiff Bias and the other class members were not authorized by the Interest Act or any other law of the State of Illinois, and they were not otherwise exempt from the Act.

217. Despite not being authorized by law to issue their triple-digit interest loans, the Non-Tribal Defendants accepted and received money from Plaintiff Bias and the class members on those loans.

218. Accordingly, Plaintiff Bias and the class members are entitled to "twice the total of all interest, discount and charges determined by the loan contract or paid by them, whichever is greater, plus reasonable attorney's fees and court costs as may be assessed by the court against the lender." 815 ILCS § 205/6.

**COUNT SIX**
**Illinois Predatory Loan Prevention Act, 815 ILCS § 205/6**
**(CLASS CLAIM BY PLAINTIFF BIAS AGAINST THE NON-TRIBAL DEFENDANTS FOR DAMAGES AND AGAINST 605 LENDING AND THE TRIBAL DEFENDANTS IN THEIR OFFICIAL CAPACITIES FOR INJUNCTIVE RELIEF)**

219. Plaintiffs reallege and incorporate by reference the allegations set forth in the preceding paragraphs.

220. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Bias brings this claim for damages for himself and on behalf of a class initially defined as follows ("Illinois Damages Class"):

> All natural persons who: (1) entered into a loan agreement with 605 Lending; (2) from Illinois; and (3) made at least one payment on the loan.

Plaintiff Bias is a member of this class.

221. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Bias also brings this claim for injunctive relief for himself and on behalf of a class initially defined as follows ("Illinois Injunctive Class"):

> All natural persons who: (1) entered into a loan agreement with 605 Lending; (2) from Illinois; and (3) have an outstanding balance on their loan.

Plaintiff Bias is a member of this class.

222. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by 605 Lending and Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

223. **Predominance of Common Questions of Law and Fact. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions include: (1) whether the interest rates used on loans violate the Illinois Predatory Loan Prevention Act; (2) whether the choice-of-law provision used in their loan agreements and selecting the tribal law are enforceable; (3) whether the loans are usurious under Illinois law; (4) whether the loans are void under the Illinois law; and (5) whether Plaintiffs and the class members are entitled to damages and/or injunctive relief.

224. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiff Bias's claims are typical of the claims of each putative class member. In addition, Plaintiff Bias is entitled to relief under the same

causes of action as the other members of the putative classes. All are based on the same facts and legal theories.

225. **Adequacy of Representation. Fed. R. Civ. P. 23(a)(4).** Plaintiff Bias is an adequate representative of the putative classes because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; he has retained counsel competent and experienced in such litigation; and he has and intends to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

226. Under the Illinois Predatory Loan Prevention Act, a lender of consumer loans may not "contract for or receive charges exceeding a 36% annual percentage rate." 815 ILCS 123/15-5-5. The Act is not to be interpreted as permitting interest above the Interest Act, however. *Id.*

227. Despite this limitation, 605 Lending and the Non-Tribal Defendants collected, attempted to collect, received, and retained principal, fee, interest, and charges on loans with interest rates far exceeding 36%, including the loans issued to Plaintiff Bias and the class members, in violation of 815 ILCS § 15-5-10.

228. The Non-Tribal Defendants are each a person or entity subject to the Illinois Predatory Loan Prevention Act.

229. Accordingly, Plaintiff Bias and the class members are entitled to cumulative damages under the Illinois Consumer Fraud and Deceptive Business Practices Act, as incorporated into the Predatory Loan Prevention Act by 815 ILCS § 123/15-10-5, including actual economic damages and punitive damages, attorneys fees and costs.

230. Plaintiffs are also entitled to injunctive relief against 605 Lending and/or the Tribal Defendants, in their official capacities, enjoining the further collection or issuance of usurious loans by 605 Lending. Without an injunction, Plaintiffs will continue to suffer the negative effects of Defendants' violations, including the accumulation of additional debt, adverse credit reporting of the invalid loans, and abusive collection practices.

**COUNT SEVEN**
**Florida Consumer Finance Act, Fla. Stat. § 516.001, *ET SEQ.***
**(CLASS CLAIM BY PLAINTIFF KNOX AGAINST 605 LENDING AND THE TRIBAL DEFENDANTS IN THEIR OFFICIAL CAPACITIES FOR INJUNCTIVE RELIEF)**

231. Plaintiffs restate each of the allegations in the preceding paragraphs as if set forth at length herein.

232. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Bias also brings this claim for injunctive relief for himself and on behalf of a class initially defined as follows ("Florida Injunctive Class"):

> All natural persons who: (1) entered into a loan agreement with 605 Lending; (2) from Florida; and (3) have an outstanding balance on their loan.

Plaintiff Knox is a member of this class.

233. **Numerosity. Fed. R. Civ. P 23(a)(1).** Upon information and belief, Plaintiffs allege that the class members are so numerous that joinder of all is impractical. The names and addresses of the class members are identifiable through the internal business records maintained by Defendants, and the class members may be notified of the pendency of this action by published and/or mailed notice.

234. **Typicality. Fed. R. Civ. P. 23(a)(3).** Plaintiffs' claims are typical of the claims of each putative class member. In addition, Plaintiffs are entitled to relief under the same causes of action as the other members of the putative class. All are based on the same facts and legal theories.

235. **<u>Adequacy of Representation</u>. Fed. R. Civ. P. 23(a)(4).** Plaintiffs are adequate representatives of the putative class because their interests coincide with, and are not antagonistic to, the interests of the members of the class they seek to represent; they have retained counsel competent and experienced in such litigation; and they have and intend to continue to prosecute the action vigorously. Plaintiffs and their counsel will fairly and adequately protect the interests of the members of the class. Neither Plaintiffs nor their counsel have any interests which might cause them to not vigorously pursue this action.

236. **<u>Predominance of Common Questions of Law and Fact</u>. Fed. R. Civ. P. 23(a)(2).** Common questions of law and fact exist as to all members of the putative class, and there are no factual or legal issues that differ between the putative class members. These questions predominate over the questions affecting only individual class members. The principal issues include: (1) whether Defendants' loans violate Florida Consumer Finance Act; and (2) whether and to what extent Plaintiffs are entitled to damages and/or injunctive relief.

237. **<u>Superiority</u>. Fed. R. Civ. P. 23(b)(3).** Questions of law and fact common to the class members predominate over questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy. The damages sought by each member are such that individual prosecution would prove burdensome and expensive. It would be virtually impossible for members of the class individually to effectively redress the wrongs done to them. Even if the members of the class themselves could afford such individual litigation, it would be an unnecessary burden on the Courts. Furthermore, individualized litigation presents a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and to the court system because of the legal and factual issues raised by Defendants' conduct. By contrast, the class action device will result in substantial benefits to the

litigants and the Court by allowing the Court to resolve numerous individual claims based upon a single set of proof in a case.

238. **<u>Injunctive Relief Appropriate for the Class</u>. Fed. R. Civ. P. 23(b)(2).** Class certification is appropriate because Defendants have acted on grounds generally applicable to the class, making appropriate equitable, injunctive relief with respect to Plaintiffs and the class members. Plaintiffs and the putative class seek an injunction ordering Defendants to cease and desist all collection, either directly or indirectly, of any amounts under the subject loans.

239. Defendants violated the Florida Consumer Finance Act by engaging in the business of making consumer finance loans within Florida without a license or other authorization under Florida law to do so.

240. Defendants never obtained a license to issue consumer loans within Florida.

241. In addition to failing to obtain a license, Defendants also issued loans to Plaintiff Knox and the class members with interest rates far exceeding 18 percent, in further violation of the Florida Consumer Finance Act.

242. Because Defendants charged excessive interest rates on consumer loans that they issued without a license under Florida law, the loans are void and unenforceable under the Florida Consumer Finance Act, and Defendants have not right to collect on the loans.

243. Plaintiff Knox and the class members are likely to be irreparably harmed by unfair credit reporting and debt collection practices, as well as monetary payments, if Defendants are not enjoined.

244. Accordingly, Plaintiff Knox and the putative class members are entitled to injunctive relief against 605 Lending and/or the Tribal Defendants, in their official capacities, enjoining the further collection of any amounts on the loans issued to them by 605 Lending.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment against Defendants as follows:

A. An Order certifying the proposed Classes under Fed. R. Civ. P. 23 (b)(3) and appointing Plaintiffs as class representatives and their counsel as class counsel, as soon as practicable;

B. An Order declaring that Defendants are financially responsible for notifying class members of the pendency of this suit;

C. An Order declaring that Defendants committed the violations of law alleged herein;

D. An Order providing for any and all injunctive relief the Court deems appropriate;

E. An Order declaring the loans of the Void Debt Class void and uncollectable;

F. An Order awarding monetary damages, including but not limited to any compensatory, incidental, or consequential damages in an amount to be determined by the Court or jury;

G. An Order awarding treble, exemplary, and punitive damages in accordance with proof and in an amount consistent with applicable precedent;

H. An Order awarding interest at the maximum allowable legal rate on the foregoing sums;

I. An Order awarding Plaintiffs their reasonable costs and expenses of suit, including attorneys' fees; and

J. Such further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), Plaintiffs demand a trial by jury.

Respectfully submitted,
**PLAINTIFFS,** *individually and on behalf of all others similarly situated*

By: */s/ Kristi C. Kelly*
Kristi Cahoon Kelly
(Bar No. 72791)
Andrew J. Guzzo*
Matthew G. Rosendahl*
**KELLY GUZZO PLC**
3925 Chain Bridge Road, Suite 202
Fairfax, Virginia 22030
Telephone: (703) 424-7572
Facsimile: (703) 591-0167
Email: kkelly@kellyguzzo.com
Email: aguzzo@kellyguzzo.com
Email: matt@kellyguzzo.com

*Counsel for Plaintiffs*

**Applications for admission forthcoming*